**FILED**
**FEBRUARY 29, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**08 C 1244**

| | |
|---|---|
| VELSICOL CHEMICAL CORPORATION, a Delaware corporation, | |
| Plaintiff, | |
| v. | Case No. |
| BAYER CROPSCIENCE GmbH, a German corporation, and BAYER CROPSCIENCE, AG, a German corporation | Judge |
| Defendants. | |

**JUDGE ANDERSEN**
**MAGISTRATE JUDGE MASON**

# COMPLAINT

Plaintiff, Velsicol Chemical Corporation ("Velsicol"), by its attorneys, David Goodman and Rebecca Hanson, Shaw Gussis, *of counsel*, complains as follows against Defendant Bayer CropScience GmbH, a German corporation and Bayer CropScience AG, a German corporation (referred to collectively as "Bayer").

1. This dispute arises from Bayer's breach of a requirements contract. Velsicol was contractually obligated to supply Bayer's requirements of hexachlorocyclotadiene. Bayer used hexachlorocyclotadiene in the manufacture of endosulfan, an insecticide that Bayer sold under various brand names and formulations for agricultural use throughout the world. Bayer purported to terminate the requirements contract in December 2006, but it did so in a manner inconsistent with its express contractual obligations to Velsicol. Specifically Bayer failed to provide the requisite notice of its decision to terminate the requirements contract, and it did so without a legitimate business reason. Bayer's breach of the contract has caused Velsicol to incur millions of dollars in damages.

{6390 CMP A0197516.DOC}

## THE PARTIES

2. Plaintiff, Velsicol, is a Delaware corporation with its principal place of business in Rosemont, Illinois. Velsicol is engaged in the business of providing and manufacturing plasticizers, food additives and industrial/agricultural intermediates including hexachlorocyclotadiene.

3. Defendants, Bayer CropService GmbH and Bayer CropScience AG, are German corporations with their principal places of business in Germany. Bayer is engaged in the business of researching, developing, manufacturing and selling a broad range of crop science products including insecticides.

## JURISDICTION AND VENUE

4. The Court has jurisdiction of this cause of action for breach of contract pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of a State and citizens or subjects of a foreign state.

5. Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(2). A substantial part of the events or omissions giving rise to this cause of action occurred in this district.

## GENERAL ALLEGATIONS

### The Hex Supply Agreement

6. On January 1, 1992, Velsicol entered into a supply agreement (the "Contract") with Hoechst Aktiengesellschaft, a German corporation. A copy of the Contract is attached as Exhibit 1.

7. The Contract was a supply agreement for the intermediate chemical, hexachlorocyclopentadiene ("Hex").

8. The Contract provides that it shall be governed by and construed in accordance with Illinois law. See Exhibit 1, ¶ 14.

9. The Contract was assigned from Hoechst Aktiengesellschaft to Bayer in 1998.

10. The initial terms of the Contract was ten years (referenced as the "Contract Years" in the Contract) running from January 1, 1992 through December 31, 2001. The Contract, by its terms, was automatically extended after the initial term for successive "Contract Years" beginning January 1, 2002.

11. Each party to the Contract was entitled to terminate the Contract as long as the party seeking to terminate the Contract provided the other party 36 months written notice in advance of the termination, and as long as the written notice of termination was tendered after December 31, 1997. Ex. 1, ¶¶ 1 and 13.

12. Bayer began to purchase Hex from Velsicol pursuant to the Contract after the Contract was assigned to Bayer by Hoechst Aktiengesellschaft, and continued to purchase Hex pursuant to the Contract through November 2006.

13. The Contract further states that "Seller shall supply, and Buyer shall purchase, 100% of Buyer's global requirements of Hex, provided the Seller will not be obligated to supply more than 1,200 MT of Hex in any one month. Seller will keep in stock at all times at least 360 MT of Hex exclusively for Buyer's disposition." See Exhibit 1, ¶ 2.

14. Further, Velsicol was required to provide Hex to the Buyer at the "prevailing price" provided for within the Contract. However, under the Contract, in the event Velsicol supplied Hex to a customer other than a customer with which it had a raw material conversion

agreement at a price less than the "prevailing price" under the Contract, the price to the Buyer would be reduced to that lower price. Ex. 1, ¶ 3.

15. Pursuant to the Contract, Velsicol has always maintained at least 360 MT of Hex exclusively for Defendant's disposition.

16. Pursuant to the Contract, Bayer was required to provide Velsicol with a written forecast and a blanket purchase order which reflects the anticipated purchases of Hex in the next succeeding calendar year by November 30 each year. See Exhibit 1, ¶ 4.

17. The Contract requires that at least thirty days before the beginning of each calendar quarter, Bayer shall send Velsicol its firm orders for the next succeeding calendar quarter. See Exhibit 1, ¶ 4.

18. The Contract requires each of the parties to keep the other currently advised, as much in advance as possible, concerning plant shut-downs and other operating information which may affect things such as production, delivery, storage and the processing or use of Hex. See Exhibit 1, ¶ 4.

19. Furthermore, the Contract requires Velsicol to ship Hex in specially designed isotainers from a fleet leased, maintained and managed in a way to meet Bayer's forecasts. See Exhibit 1, ¶ 6.

20. In order to meet its obligations to Bayer under the Contract, and as Bayer was aware, Velsicol was obligated to enter long-term leases for the isotainers dedicated to the fulfillment of the Bayer Contract. In order to meet its contractual obligations to Bayer with respect to the shipment of Hex to meet Bayer's demand under the Contract, Velsicol was required to lease 65 isotainers dedicated to fulfilling the Bayer Contract at an annual lease cost of

approximately $400,000 per year and was required to enter into long term leases with respect to these isotainers.

## Endosulfan

21.　Velsicol manufactures Hex at its Memphis, Tennessee plant.

22.　Hex is a chemical used to manufacture endosulfan, an insecticide used throughout the world for agricultural purposes.

23.　Defendant uses endosulfan in three of its trademarked insecticides: Malix®, Phaser®, and Thiodan®.

24.　Bayer admits that as early as May 2006, it had already decided to exit from the manufacture of endosulfan. In fact, in 2007, after purporting to terminate the Contract, Bayer's Purchasing Manger admitted that Bayer had been evaluating the termination of its endosulfan operations as early as 2002.

25.　Bayer's decision to terminate its endosulfan operations had been made years in advance of communication of the decision to Velsicol but was concealed from Velsicol so that Bayer could treat the requirements contract as an option contract.

26.　Bayer failed to provide notification of its decision to terminate the Contract to Velsicol.

27.　In December 2006, Bayer's managing director wrote a letter to Velsicol in which Bayer advised that it planned to shut down its endosulfan production on June 30, 2007.  Ex. 2.

28.　In that same letter, Bayer admits that "as a consequence of the termination of our endosulfan production, we would like to terminate the [Contract] at the earliest legally permissible time." Ex. 2.

29. Bayer admitted in December 2006 that it had not terminated the Contract yet, but intended to do so. Ex. 2.

30. In a subsequent February 2007 letter from Bayer's managing director to the global sales director of Velsicol, Bayer stated it had decided to close down the endosulfan production plant even earlier, in April 2007. Ex. 3.

31. Contrary to the termination request in the December 2006 letter, three months later Bayer's same managing director stated that rather than wanting to terminate the Contract, Bayer was not terminating the Contract but rather was merely informing Velsicol that Bayer will have no further need for Hex after the plant shut-down. Ex. 3.

32. Bayer knew prior to May 2006 that it was considering shutting down the endosulfan plant, and knew other operating information that would affect the production, storage and use of Hex but chose to withhold their information from Velsicol.

33. In an effort to mislead and deceive Velsicol, and to control the demand for endosulfan, and even after Bayer informally advised that it contemplated terminating its own manufacturing of endosulfan, it also told Velsicol that it expected its demand for Hex would continue unchanged as Bayer would purchase endosulfan for resale from other entities, which such entities would be purchasing Hex for such endosulfan production from Velsicol.

34. Bayer's putative termination of its endosulfan operations and putative termination of the Contract were not in good faith.

35. Velsicol relied on Bayer silence concerning changes in its manufacturing and distribution of endosulfan and its failure to provide the requisite notice of its intent to terminate

the Contract in Velsicol's strategic planning and in entering into the long-term leases for the Hex storage isotainers required by Velsicol to fulfill its obligations under the Contract.

36. Bayer's conduct is an attempt to terminate the Contract without providing the requisite notice and to improperly shift the risks attendant to its endosulfan operations onto Velsicol.

## COUNT I
### (Breach of Contract)

37. Velsicol incorporates and re-alleges paragraphs 1-36 as if fully set forth herein.

38. Velsicol has performed all duties required of it in connection with the Contract.

39. Bayer's failure to provide Velsicol with the requisite advance of the information prior to May 2006 regarding the changes in its operation information affecting production, delivery, storage and processing/use of Hex, and the *de facto* termination of the agreement without the required thirty-six month notice breached the Contract.

40. As a direct and proximate result of the Defendant's breaches, Velsicol has been damaged in an amount to be determined at trial including but not limited to damages suffered from the lease and maintenance of the isotainers and the lost profits for the Hex sales, and cost of maintaining a supply of Hex for Bayer's purchase.

WHEREFORE, Plaintiff, Velsicol Chemical Corporation, respectfully requests that this Court enter judgment in favor of Velsicol and against the Defendants for compensatory damages in an amount to be determined, and for such other relief as this Court deems just.

                                                       Respectfully submitted,

                                                       VELSICOL CHEMICAL CORP.

Dated:  February 29, 2008            By:  /s/ David B. Goodman
                                                            One of its attorneys

David B. Goodman (#6201242  )
Rebecca J. Hanson (#6280296)
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 N. Clark St., Suite 800
Chicago, Illinois 60610
(312) 541-0151