JUDGE ANDERSEN
MAGISTRATE JUDGE MASON

08 C 1244

# EXHIBIT 1

HEX SUPPLY AGREEMENT

This Agreement is entered into as of the 1st day of January, 1992, between Velsicol Chemical Corporation, 10400 W. Higgins Road, Rosemont, Illinois, U.S.A. 60018 ("Seller"), and Hoechst Aktiengesellschaft, 6230 Frankfurt am Main 80, Federal Republic of Germany ("Buyer").

INTRODUCTION

A.   Buyer and Seller have engaged in discussions regarding Buyer's interest in purchasing its requirements of the intermediate chemical, Hexachlorocyclopentadiene ("Hex") produced by Seller at its Memphis, Tennessee, U.S.A. Plant (the "Plant") to be used by Buyer in the manufacture of the pesticide, endosulfan, which Buyer sells and markets in a number of areas throughout the world.

B.   The parties have now reached an understanding with respect to the terms and conditions under which they will deal with each other regarding Buyer's purchases of its requirements of Hex supplied and produced by Seller in accordance with the Specifications attached hereto as Exhibit A, or as may be modified hereafter by mutual written agreement of the parties (the "Specifications").

Accordingly, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties agree as follows:

1.  <u>Term</u>.  This Agreement shall be in effect for a term of 10 contract years of 12 months each (the "Contract Years") from January 1, 1992 through December 31, 2001, and thereafter for successive Contract Years, provided that either party may terminate this Agreement on 36 months notice at any time after December 31, 1997.

2.  <u>Purchase and Sale of Hex</u>.  Seller shall supply, and Buyer shall purchase, 100% of Buyer's global requirements of Hex, provided the Seller will not be obligated to supply more than 1,200 MT of Hex in any one month.  Seller will keep in stock at all times at least 360 MT of Hex exclusively for Buyer's disposition.

3.  <u>Prices and Most Favored Price Treatment</u>.  Buyer shall pay for Hex in U.S. Dollars as follows:

| Price $ U.S./lb. CPT Buyer's Works <u>Frankfurt(M)-Griesham</u> | For Calendar Year <u>Volume (M.T.)</u> |
|---|---|
| .73 | 0 - 1999 |
| .72 | 2000 - 2999 |
| .71 | 3000 - 3999 |
| .70 | 4000 - 4999 |
| .69 | 5000 and over |

It is understood that the parties may negotiate revisions to the stated prices at any time, and that any change in the applicable freight rates, either an increase or a decrease, shall automatically be reflected in the prices in effect at the time of any such change.  If Seller during the term of this Agreement should sell Hex to any customer, except any customer with which Seller has a raw material conversion agreement, at a lower price than the prevailing price provided herein, then Buyer shall receive such lower price on Hex quantities sold at the lower price while such price is in effect.  To determine whether such lower price has been granted, Seller's selling prices of Hex - including the prevailing price under this Agreement - shall be reduced to Seller's ex Plant prices.

4.    <u>Forecasts and Orders</u>.  By November 30, 1991, and by each November 30 thereafter, Buyer will provide Seller with a written forecast and a blanket purchase order which reflect Buyer's anticipated purchases of Hex during the next succeeding calendar year.  At least 30 days before the beginning of each calendar quarter, Buyer shall send to Seller its firm orders for the next succeeding calendar quarter.  Each party will keep the other currently advised, as much in advance as possible, concerning plant shut-downs and other operating information which may affect such things as production, delivery, storage and processing/use of Hex.

5.  <u>Taxes and Other Charges</u>.  If after January 1, 1992 any
    National, State or Municipal taxes, excise or other charges
    not now in effect shall be directly imposed upon the
    production, sale or - if relevant - transportation of Hex or
    any raw materials used therein, or similarly, if any such
    tax or charge now or later in effect shall be changed, the
    price prevailing under this Agreement for Hex shall be
    changed by the amount thereof.

6.  <u>Shipment/Delivery</u>.  Delivery of Hex shall be made CPT
    Buyer's works at Frankfurt am Main-Griesheim.  The term
    "CPT" shall have the meaning attributed thereto in the
    relevant provision of INCOTERMS 1990, which is hereby
    incorporated by reference.  Seller will (i) ship Hex in
    isotainers from a fleet leased, maintained and managed in a
    way to meet Buyer's forecasts, (ii) pack approximately 20 MT
    of Hex into each isotainer, and (iii) follow Buyer's
    instructions regarding port and ultimate destination.  Buyer
    will maintain sufficient storage capacity, and otherwise use
    its best efforts to enable isotainers to be promptly
    unloaded and returned to Seller.  The price for Hex includes
    the transportation costs for the returning of the empty
    isotainers.

7.  <u>Payment</u>.  Buyer shall pay for Hex net 90 days from date of
    invoice, 2% discount for net 10 days payment.

8.  <u>Warranty; Exclusions</u>.  (a) Seller warrants only that Hex will conform to the Specifications, and makes no other warranty, express or implied, including any implied warranty of merchantability or of fitness for a particular purpose.

(b) Buyer assumes all risk and liability for (i) handling Hex following delivery by Seller to the designated destination, and (ii) consequences of the use thereof, whether used singly or in combination with other materials, and whether or not used in accordance with Seller's recommendations, assistance or instructions.

9.  <u>Claims in Respect of Quality</u>.  In case of justified and properly notified (see Section 12 hereof) complaints regarding the quality as to the Specifications of any individual Hex shipment, Buyer shall have the right to return said shipment to Seller at Seller's expense, and Seller shall promptly issue appropriate shipping instructions for such return.  With regard to so returned quantities, Seller shall provide for a replacement quantity as soon as reasonably possible thereafter.

Subject to the following paragraph, any further claims of Buyer regarding the quality are excluded.  Claims of Buyer in respect of breach of warranty as set forth in Section 8 hereof shall not exceed the respective purchase price of Hex under this Agreement in respect of which such claims are

made, and in no event shall Seller's liability extend to any
indirect, incidental or consequential damages including,
without limitation, lost profits or lost production.

It is understood and agreed that Seller is not an insurer
and that the charges made by Seller for Hex are based solely
on its value and the limited liabilities set forth in this
Agreement.  Such charges do not contemplate or allow for
risk of any potential liability for indirect, incidental or
consequential damages, including lost profits or lost
production.  The parties agree that this allocation of risk
and liability is fair and reasonable.

10.  <u>Indemnities</u>.  (a) Seller will indemnify, hold harmless and
defend Buyer from and against any claim, and all costs and
expenses, including legal fees, related thereto, on account
of death, personal injury or property damage arising out of,
exposure to, or in any way connected with, Hex before it
reaches the destination specified by Buyer, except only to
the extent caused by, or due to, Buyer's negligent act or
omission.

(b)  Buyer will indemnify, hold harmless and defend Seller
from and against any claim, and all costs and expenses,
including legal fees, related thereto, on account of death,
personal injury or property damage arising out of exposure
to, or in any way connected with, Hex, after it reaches the

destination specified by Buyer, except only to the extent caused by, or due to, Seller's negligent act or omission.

11. Force Majeure.  Neither party hereto shall be liable nor deemed to be liable to the other party for failure or delay in meeting any obligation hereunder due to force majeure, such as strikes and/or lockouts (whether of their own employees or those of others and whether or not the party against whom such action is taken could have avoided the same by acceding to the demand of the employees responsible for such action), Acts of God, war, fire, flood, embargo litigation, acts of government or of any agency, instrumentality or any political subdivision thereof, or any other cause beyond the reasonable control of the party which had the duty to perform.

Either party whose performance is thus delayed or impeded shall inform the other thereof without delay and shall use all reasonable efforts to overcome the effects of force majeure as soon as possible.

12. Claims.  Any claims hereunder with respect to any quantities of Hex must be asserted by Buyer within 45 days of Buyer's receipt thereof.

13. <u>Notices</u>.  All notices hereunder shall be in writing and shall be deemed given when delivered personally or when sent by registered or certified mail, telex, or telefax to the party being notified at the address shown above, or such other address as may be designated in writing.

14. <u>Governing Law</u>.  This Agreement is made in Illinois and shall be governed by and construed in accordance with the internal laws of the State of Illinois, U.S.A.

15. <u>Partial Invalidity</u>.  Should one or more provisions of this Agreement be or become invalid or unenforceable, then the parties hereto shall substitute such provisions by valid ones, which in their economic effect come so close to the invalid or unenforceable provisions that it can be reasonably assumed that the parties would have contracted this Agreement also with those new provisions.  In case such new provisions cannot be found, the invalidity or unenforceability of one or more provisions of the Agreement shall not affect the validity of the Agreement as a whole, unless the invalid or unenforceable provisions are of such essential importance for this Agreement that is is to be reasonably assumed that the parties would not have contracted this Agreement without them.

16. <u>Successors and Assigns</u>.  Neither this Agreement nor any right or obligation set forth herein may be transferred or assigned by either party without the prior written consent of the other which will not be unreasonably withheld.  It is understood and agreed that this Agreement shall be fully binding on, and enforceable against, the successors or assigns of either party, including any purchaser of a majority interest in either party, or of the assets of either necessary for the performance of obligations hereunder.

17. <u>Entire Agreement; Amendments; Waivers</u>.  This Agreement, including Exhibit A, contains the entire understanding of the parties with regard to the subject matter hereof, and may be amended, modified or supplemented, in whole or in part, only by a mutual written agreement.  The failure of either party to enforce at any time any provision of this Agreement shall not be construed as a waiver of such provision, nor in any way affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Executed on behalf of each party as of the day and year first above written.

BUYER:                                SELLER:

HOECHST AKTIENGESELLSCHAFT             VELSICOL CHEMICAL CORPORATION

By: _____         By: _____
    Name:                                 Name:   David M. Frederick

    Title:                                Title: Vice President
                                                 International Group